UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

**HEATHER SNOW,**　　　　　　　　　　　　　**CASE NO.**

　　　　**Plaintiff,**

v.

**GEORGIA PORTS AUTHORITY,**

　　　　**Defendant.**
　　　　_____/

## COMPLAINT

Plaintiff, HEATHER SNOW, hereby sues Defendant, GEORGIA PORTS AUTHORITY, and alleges:

### NATURE OF THE ACTION

1.　　　This is an action brought under 42 U.S.C. §2000e et seq., 42 U.S.C. §1981a, 42 U.S.C. §§12101 et seq., and the Family and Medical Leave Act (FMLA) of 1993, 29 U.S.C. §§2612, 2624.

2.　　　This is an action involving claims which are, individually, in excess of Seventy Thousand Dollars ($75,000.00), exclusive of costs and interest.

### THE PARTIES

3.　　　At all times pertinent hereto, Plaintiff, HEATHER SNOW, has been a resident of the State of Georgia and was employed by Defendant. Plaintiff is a member of a protected class because of her association with a disabled person - her mother, who was diagnosed with late-stage cancer May 6, 2020, and who passed away November 25, 2020. Plaintiff is also a member of protected classes because of her opposition to unlawful practices, and her need to exercise rights under the FMLA.

4.      At all times pertinent hereto, Defendant, GEORGIA PORTS AUTHORITY, has been organized and existing under the laws of the State of Georgia.  At all times pertinent to this action, Defendant has been an "employer" as that term is used under the applicable laws identified above.

5.      Plaintiff has satisfied all conditions precedent to bringing this action in that she filed a charge of discrimination with the Equal Employment Opportunity Commission.  This action is timely brought thereafter. Plaintiff has otherwise satisfied all conditions precedent.

## STATEMENT OF THE ULTIMATE FACTS

6.      Plaintiff alleges that she was subjected to disparate terms and conditions, harassed, and terminated for and because of her association with a disabled person, her mother.  Plaintiff also alleges that she was unlawfully retaliated against, in part because of her eligibility for FMLA leave and taking FMLA leave, and in part because of her opposition to unlawful practices. Plaintiff also suffered interference with her rights to FMLA leave.

7.      Plaintiff was employed by defendant in August 2016 at the Bainbridge, Georgia terminal as an Operations Administrative Coordinator.  She was fired in early June, 2020 on pretextual grounds. The actual reasons for her firing were that she previously sought and utilized leave under the Family & Medical Leave Act, for which she was mercilessly harassed and forced to use leave unnecessarily; that she associated with a severely disabled individual, her mother, Trela Robinson, who has since passed away; and that she voiced opposition to the unlawful practices against her.

8.      The Georgia Port Authority is an entity created by the state of Georgia to own, operate, and manage George's seaports. It has more than 1000 employees in multiple locations around the

state. Among those locations are a facility in Bainbridge, Georgia, known as the Bainbridge Terminal. At all times pertinent hereto, the terminal was headed by manager Stuart Kelley.

9. In late 2018, Plaintiff notified her supervisors that she was going to have bariatric surgery and that she would need a minimum of two weeks off for recovery. Plaintiff notified Stuart Kelley, and then Andrew Brooks. Plaintiff notified Mr. Brooks at the direction of Mr. Kelly. She told Mr. Kelly in person sometime in December 2018. She reached out to Mr. Brooks on or about December 28, 2018 by email. Lena was having weight -related health problems and opted to have this surgery, which she discussed with her primary care physician in Bainbridge. Mr. Kelly told Plaintiff that he did not understand the policies for taking leave, including the FMLA, which is why Kelly directed Plaintiff to Mr. Brooks. Plaintiff got approval for her surgery shortly after her conversation with Mr. Kelly. The surgery was set to take place January 21, 2019, and Plaintiff in fact left town January 19, 2019 to begin the trip to the surgery location.

10. Plaintiff went out of her way to make sure she was following Defendant's procedure for medical leave. After the surgery, Plaintiff reported to work on or about February 4, 2019. She experienced various medical side effects from the surgery that required her to miss additional time. By example, Plaintiff was suffering from dehydration during her first two weeks back that was so severe that on or about the Berry 14, 2019, she had to go to the emergency room at Bainbridge Memorial Hospital. She was so dizzy that she was at the point of almost passing out. Dehydration is apparently a side effect, at least a common one, after bariatric surgery. She returned to work sometime in late February or early March.

11. During this period of time, Plaintiff began experiencing severe harassment from a human resource official with Defendant named Ashley Tipton. Tipton's apparent title was Senior

Occupational Health Nurse, and she is believed located in Savannah Georgia. Tipton, unbelievably, phoned Plaintiff while she was at the hospital, to criticize Plaintiff for not properly filling out FMLA paperwork before her surgery, and that Plaintiff's job was on the line. So this criticism wasn't even about the current medical complication, but the original absence for the underlying surgery. Tipton complained that Plaintiff had not properly filled out forms, and that Plaintiff didn't have the proper release forms to come back to work.

12. At that point, Plaintiff had never heard of or at least did not know the details of the Family & Medical Leave Act. To Tipton's complaint that Plaintiff didn't fill the paperwork out properly, Plaintiff responded that she didn't fill it out at all. Tipton responded that it was Plaintiff's job to know the legal regulations and to follow them precisely. Tipton also said that Plaintiff would most likely lose her job for taking FMLA leave and not "filling out the proper forms." Plaintiff informed her that she did reach out to her supervisor, and direct supervisor, and explained to them what was happening, and neither one of them informed Plaintiff that she had to fill out any forms or contact human resources. And Plaintiff forwarded to Tipton the email from Andrew Brooks to Plaintiff saying that everything was noted and received. Tipton responded, it doesn't matter, and if Plaintiff doesn't get the situation fixed immediately, she could be unemployed. Tipton added that Plaintiff was forbidden from returning to work until the FMLA situation was resolved. That is why Plaintiff did not return to work after being released from the hospital sooner than she did - because Tipton was forcing her to stay out of work.

13. Plaintiff immediately struggled to obtain medical documentation from the healthcare provider who performed the surgery. Plaintiff was devastated from the abusive tone and job threats from Tipton. Sometime in the next week, Plaintiff gathered the paperwork to pass along. In the

meantime, Plaintiff called Mr. Kelly on February 14, 2019, and, crying, told Mr. Kelly about Tipton's aggressive and abusive behavior. Kelly responded that it would get worked out and she would not lose her job, and asserted that he apparently made a complaint to Bill Dawson, Mr. Kelly's supervisor. Plaintiff told Mr. Kelly that she hoped to be back within a few days but that she was forbidden to return at the time by Ms. Tipton. Tipton told Plaintiff she had to have a specific release from a doctor. Plaintiff got the release early the next week, possibly the week of February 18, when she emailed it to Ms. Tipton.

14. After sending the email, Plaintiff heard back from his Tipton, who said that the paperwork was "not acceptable" and that they needed a "second opinion." The surgery had been performed in Mexico, in the original paperwork was in Spanish. Tipton took issue with that, criticizing the fact that it had to go through a translator, saying it was not acceptable, and that Plaintiff's job was still on the line. It bears noting that Plaintiff provided the paperwork in English. In other words, it had already been translated by the time it reached Ms. Tipton. Clearly, the paperwork was complete and legitimate. Ms. Tipton simply did not like the idea that someone Spanish originally completed the forms.

15. Bizarrely, Tipton also told Plaintiff that she had to go see another doctor to confirm that Plaintiff needed bariatric surgery. Plaintiff went to her primary care physician in Bainbridge, who filled out more FMLA paperwork confirming that Plaintiff needed the surgery and the time off to recover, for health reasons. That took another week for Plaintiff's primary care physician to get the paperwork to Ms. Tipton. This was causing additional strains for Plaintiff at her Bainbridge office, because at that time she was ready to return to work, but was still being barred by Ms. Tipton because of her use of FMLA leave and because of Ms. Tipton's micro-criticisms about how

the paperwork was completed. Ms. Tipton was specifically told by Plaintiff that she was absolutely ready to return to work, but Ms. Tipton would not allow it. Plaintiff was using FMLA leave and vacation time, but was being forced to burn off both because of Tipton's misconduct.

16. Even after paperwork was sent to Ms. Tipton, she continued to claim that she had not received it, and that Plaintiff could not return to work. During this time, Plaintiff was updating Mr. Kelly, calling him and answering his calls because Mr. Kelly was forced to perform Plaintiff's work while Ms. Tipton was keeping her out. Ultimately, Plaintiff returned on or about March 4, 2019.

17. Once Plaintiff was released from her surgery, and finally allowed to return to work, she faced another medical emergency, but this time not her own. On May 6, 2019, Plaintiff's mother was diagnosed with Stage 4 colon cancer. Plaintiff immediately began taking care of her mother. Plaintiff notified Mr. Kelly that she was going to be out for a few days to care for her mother, after Plaintiff was notified by her mother's surgeon and that Plaintiff needed to drive to the hospital immediately. Plaintiff stayed in constant contact with Mr. Kelly as this new situation evolved. Plaintiff offered to come into work for a few hours, but Mr. Kelly declined, saying that because she was using FMLA, she could not just come into work. That was also inaccurate, because the FMLA explicitly allows intermittent leave. Once again, Plaintiff was being forced to take unnecessary leave in violation of her rights under the FMLA. This was on her about May 8 or 9, 2019. Plaintiff was specifically offering to Mr. Kelly that she could come in and work on a modified schedule, or intermittently. Plaintiff was absolutely able to report to work, but was being refused by Mr. Kelly.

18. Plaintiff's mother's surgeon suggested that her mother would need ongoing care, and that they should fill out FMLA paperwork to cover time away when caring for their mother. Plaintiff notified Ms. Tipton of her need for FMLA leave to cover for her mother, and Plaintiff had more than one physician or surgeon treating her mother fill out the paperwork. Plaintiff was eventually approved for intermittent FMLA leave for the purpose of caring for her mother.

19. During the first three weeks following the cancer diagnosis of her mother, Plaintiff was for the most part at the hospital, because her mother was floating in and out of consciousness and someone needed to stay with her to care for her. Someone also had to assist her when physicians came in, because her mother could not understand what the positions were explaining. After her mother was released, and having just had major surgery, her mother had trouble getting out of bed unassisted, showering, and using the restroom. Plaintiff's mother also had an implanted medical device that required assistance by another person. During this time, Plaintiff continued to stay in touch with Mr. Kelly, who was clearly agitated at having to do some of Plaintiff's work.

20. Upon information and belief, Plaintiff never ran out of FMLA leave before she was illegally fired. But Ms. Tipton would regularly update Plaintiff on how much leave she had left, until August 2019, when Plaintiff had about 80 hours left. During a phone call with Ms. Tipton, Ms. Tipton told Plaintiff that she had about 80 hours left and said that "If I were you, I would not use that leave." Tipton added that if she did use all her FMLA leave, she would be fired, and that it did not look good anyway if she used it all up. Those specific comments from a company official discouraged Plaintiff from using the leave available to her, and from caring for her dying mother. Plaintiff suffered grave emotional distress from these comments, because there were times that

Plaintiff's mother was having horrific hallucinations due to the pain medication, and Plaintiff could not stay with her for fear of losing her job.

21. So rather than care for her mother in her precious final days, Plaintiff, because of the terrible harassment by Ashley Tipton and Stuart Kelly, went to work. By August 2019, Plaintiff was limiting her use of FMLA leave, based on the threats from Tipton, to take her mother to medical appointments. At this point, Mr. Kelly joined the chorus of outrageous commentary, saying things to Plaintiff such as that *Plaintiff didn't really know if her mother was going to die, but if Plaintiff lost her job, what would she do*? Mr. Kelly also told Plaintiff that "You don't need to spend that much time with her," meaning Plaintiff's mother. Kelly also told Plaintiff that she was hurting the company. Andrew Brooks also called Plaintiff during this period of time, in June 2019, berating Plaintiff and telling her what a bad situation she was putting the company in for not being there, and asking Plaintiff when she was "going to get back in there and do your job?"

22. In light of these comments, Plaintiff was endeavoring to work as many hours a week as she could. Even so, there were times her mother had to go to chemotherapy, and Plaintiff would have to accompany her. There were other times where Plaintiff would have to go with her mother to a cancer center on her off weeks from chemotherapy to get hydration IVs, because her mother would get gravely ill and could not drink enough fluids.

23. Plaintiff, because of the extraordinarily cruel comments from management of Defendant, managed to extend her remaining 80 hours through February 2020, when Plaintiff was able to renew her hours after the passage of time that replenished her available leave. Once again, Tipton threatened to have Plaintiff fired if she didn't swiftly update her FMLA paperwork.

24. In or about April 2020, Plaintiff was exposed to COVID-19 outside the workplace. Plaintiff sought advice, as she had always done, from Mr. Kelly, who recommended that she speak with Mark Brown in the medical office for the Georgia Ports Authority. Plaintiff explained the situation to the nurse practitioner she spoke with, and she was told to quarantine for two weeks. Plaintiff called Mark Brownback, and also called Mr. Kelly to explain the situation. Approximately two days afterwards, Plaintiff began experiencing symptoms associated with the virus. Plaintiff also reached out to Ms. Tipton, who recommended that Plaintiff contested. Plaintiff also filled out additional FMLA paperwork associated with the coronavirus. Eventually, Plaintiff tested negative. But Ms. Tipton was still not allowed to return to work. Around that time, she received a phone call from a Mr. Charles Pennington, who identified himself as a human resource manager, and he also threatened plaintiff with being fired.

25. Mr. Pennington also accused Plaintiff, falsely, of being a liar. Plaintiff returned to work for a short period of time before she was fired. Defendants agents concocted a series of falsehoods to justify her termination. One was that Plaintiff was running a second business out of her home. The other was that she was working as a personal trainer. The first business, selling something called Arbonne, violated no rules of Defendant. At that point, Plaintiff had hosted two home Arbonne parties, much like selling Tupperware.   As for the personal trainer business, Plaintiff had not made one sent, and it had nothing to do with Defendant. In fact, Plaintiff had freely talked about both activities to help support herself with Mr. Kelly, although Mr. Kelly falsely claimed he did not know of them. But he did, and he told Plaintiff he did not consider them a second job. Eventually, Defendants agents change the locks to bar Plaintiff, and Mr. Kelly called Plaintiff in, said he had some bad information, but that she was about to be fired so he asked her to stay for a

few minutes so that he could get Mr. Pennington on the phone. Mr. Pennington indeed called, and said that Plaintiff was being fired for violating a second job policy because Plaintiff did not put it in writing. The grounds were absolutely false. Plaintiff was fired, and harassed before she was fired, on a prolonged basis because of her own need for medical leave, and because of her association with, and the use of leave for, her deceased mother.  Plaintiff's mother, Trella Robinson, died of cancer November 26, 2020, five and a half months after she was fired, in part, for caring for her.

## COUNT I

### ASSOCIATIONAL DISABILITY DISCRIMINATION

26. Paragraphs 1-26 are realleged and incorporated herein by reference. Plaintiff incorporates all the prior allegations because the factual assertions therein apply in whole or in part to this claim.

27. This is an action against Defendant for associational disability discrimination brought under 42 U.S.C. §§12101 et seq.

28. Plaintiff, during her employment, associated with a disabled person, specifically her mother, who was diagnosed with late-stage cancer and who died just months after Plaintiff was fired.

29. Defendant is liable for the way Plaintiff was treated.  Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

30. In essence, the actions of agents of Defendant, which were each condoned and ratified by Defendant, were driven by Plaintiff's association with a disabled person.

31. The discrimination complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant. The events set forth herein lead, at least in part, to Plaintiff's termination.

32. Defendant's conduct and omissions constitutes intentional discrimination and unlawful employment practices based upon association with a disabled person.

33. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past and are continuing.

## COUNT II

### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT
### INTERFERENCE & RETALIATION

34. Paragraphs 1-26 are incorporated herein by reference. Plaintiff incorporates all the prior allegations because the factual assertions therein apply in whole or in part to this claim.

35. This is an action against Defendant for retaliation against Plaintiff after she took leave, or expressed interest in taking leave or otherwise asserting rights under, the FMLA. Defendant also interfered with Plaintiff's right to take leave and/or retaliated against her after taking FMLA authorized leave.

36. Plaintiff sought to exercise rights protected by the FMLA due to a serious health condition and she was thereafter harassed and fired.

37. Plaintiff worked for Defendant for more than one year and for more than 1,250 hours prior to requesting leave. Defendant also employs more than 50 employees and is subject to the provisions of the FMLA, and in fact extended FMLA leave to Plaintiff, multiple times. Plaintiff's rights to leave were violated under the FMLA. Defendant harassed Plaintiff and took adverse personnel actions against her for taking leave.

38. Plaintiff was denied rights and benefits conferred by the FMLA as she was terminated after requesting and/or taking FMLA authorized leave.

39. As a direct and proximate cause of Defendant's willful, wanton, and malicious acts described in part above, Plaintiff has sustained damages for the loss of her employment, as well as the security and peace of mind it provided her. Plaintiff has sustained mental, nervous, and emotional injury. Plaintiff has incurred additional damages including lost wages, pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and other damages attendant with the loss of her job. These damages have occurred in the past, are occurring at present and will continue in the future.

40. Defendant's violations of the FMLA were willful.

## COUNT III

## RETALIATION - ADA

41. Paragraphs 1-26 are realleged and incorporated herein by reference. Plaintiff incorporates all the prior allegations because the factual assertions therein apply in whole or in part to this claim.

42. This is an action against Defendant for retaliation for opposing unlawful practices, under the laws enumerated herein.

43. Plaintiff opposed unlawful practices in the workplace, including but not limited to her voiced opposition to the discriminatory treatment against her because of her association with her mother, a disabled individual who was diagnosed with, and who soon thereafter passed away from, late-stage cancer. Plaintiff was retaliated against thereafter, including but not limited to her firing.

44. Defendant is liable for the way Plaintiff was treated. Defendant controlled the actions and inactions of the persons making decisions affecting Plaintiff or it knew or should have known of these actions and inactions and failed to take prompt and adequate remedial action or took no action at all to prevent the abuses to Plaintiff.

45. The retaliation complained of herein affected a term, condition, or privilege of Plaintiff's continued employment with Defendant. The events set forth herein lead, at least in part, to Plaintiff's termination.

46. Defendant's conduct and omissions constitutes intentional retaliation in response to Plaintiff's opposition to unlawful employment practices.

47. As a direct and proximate result of Defendant's conduct described above, Plaintiff has suffered emotional distress, mental pain and suffering, past and future pecuniary losses, inconvenience, bodily injury, mental anguish, loss of enjoyment of life and other non-pecuniary losses, along with lost back and front pay, interest on pay, bonuses, and other benefits. These damages have occurred in the past, are permanent and continuing.

48. Plaintiff is entitled to punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following relief:

    (a)    that process issue and this Court take jurisdiction over this case;

    (b)    that this Court grant equitable relief against Defendant under the applicable counts set forth above, mandating Defendant's obedience to the laws enumerated herein and providing other equitable relief to Plaintiff;

    (c)    enter judgment against Defendant and for Plaintiff awarding damages to Plaintiff from Defendant for Defendant's violations of law enumerated herein;

    (d)    enter judgment against Defendant and for Plaintiff permanently enjoining Defendant from future violations of federal law enumerated herein;

    (e)    enter judgment against Defendant and for Plaintiff awarding Plaintiff attorney's fees and costs; and

    (f)    grant such other further relief as being just and proper under the circumstances, including liquidated damages, and reinstatement.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury on all issues set forth herein which are so triable.

DATED this 25th day of May 2021.

    Respectfully submitted,

    /s/ Jim Garrity
    Jim Garrity; FBN 121837
    MARIE A. MATTOX, P.A.
    203 North Gadsden Street
    Tallahassee, FL 32301
    (850) 383-4800 (telephone)
    ATTORNEYS FOR PLAINTIFF